UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
DR. DAN GIURCA,

                                        Plaintiff,

        - against -                                    **OPINION & ORDER**

GOOD SAMARITAN HOSPITAL, BON                   No. 19-CV-7761 (CS)
SECOURS CHARITY HEALTH SYSTEM, and
WESTCHESTER MEDICAL CENTER HEALTH
NETWORK,

                                        Defendants.
--------------------------------------------------------------x

Appearances:
Michael H. Sussman
Sussman & Associates
Goshen, New York
*Counsel for Plaintiff*

Michael J. Keane
Gillian Barkins
Garfunkel Wild, P.C.
Great Neck, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is the motion for summary judgment of Defendants Good Samaritan

Hospital ("Good Samaritan"), Bon Secours Charity Health System ("Bon Secours"), and

Westchester Medical Center Health Network ("WMC") (collectively, "Defendants").  (ECF No.

84.)  For the following reasons, the motion is GRANTED.

## I.    **BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 Statements,

responsive 56.1 Statements, declarations, and supporting materials.[1]  The facts are undisputed

except as noted.

Westchester County Health Care Corporation ("WMCHealth") is a network of affiliated

hospitals in the Hudson Valley, including WMC.  (Ds' 56.1 Stmt. ¶ 1.)  Bon Secours, also a part

---

[1] I will refer to Defendants' "Local Rule 56 Statement of Material Undisputed Facts," (ECF No. 95), as "Ds' 56.1 Stmt."  I will refer to "Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Undisputed Facts," (ECF No. 86 at 1-47), as "P's 56.1 Resp.," and Plaintiff's Counterstatement, (*id.* at 47-51), as "P's 56.1 Stmt."  The Counterstatement – which includes facts that Plaintiff finds helpful and contends are not in dispute – violates Local Rule 56.1, which permits only a counterstatement of "additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute."  *Ostreicher v. Chase Bank USA, N.A.*, 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020).  I have considered Plaintiff's counterstatement to the extent it raises material facts contended to be in dispute.  I also note that the counterstatement, or at least portions of it, appears to have been drafted by Plaintiff personally, as it refers to him in the first person.  (*See, e.g.*, P's 56.1 Stmt. ¶¶ 25, 30, 32.)  In addition, where a statement in Defendants' Rule 56.1 Statement is properly supported, and Plaintiff does not specifically deny it with evidence, the statement is deemed admitted for purposes of this motion.  *See, e.g.*, *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (summary order); *Wallace v. City of N.Y., Dep't of Educ.*, No. 20-CV-1424, 2021 WL 6127386, at *1 n.1 (S.D.N.Y. Dec. 28, 2021); *Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000); L.R. 56.1(c); L.R. 56.1(d).

Defendants' counsel submitted a declaration in support of the motion, (ECF No. 89), but "[u]nlike the typical attorney affirmation, which simply attaches and identifies exhibits for the Court," *Dejana Indus., Inc. v. Vill. of Manorhaven*, No. 12-CV-5140, 2015 WL 1275474, at *2 (E.D.N.Y. Mar. 18, 2015), this declaration included an argumentative summary of the evidence.  Such a declaration is "improper and inadmissible" because it "could not possibly be based on personal knowledge because it is based entirely on counsel's own interpretation of the evidence in the record," *id.*; *see H.B. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881, 2012 WL 4477552, at *5-6 (S.D.N.Y. Sept. 27, 2012), and may be an improper attempt to bypass the page limits on memoranda of law set by my individual practices, *see Quattlander v. Ray*, No. 18-CV-3229, 2021 WL 5043004, at *2 n.4 (S.D.N.Y. Oct. 29, 2021).  Accordingly, I consider the declaration only to the extent it identifies the attached exhibits.

of WMCHealth, is a Catholic not-for-profit health system that includes Good Samaritan, located in Suffern, among other hospitals.  (*Id.* ¶ 2.)  As all Catholic hospitals are required to do, the hospitals of Bon Secours have adopted a code of conduct called the Ethical and Religious Directives for Catholic Health Care Services (the "ERDs").  (*Id.* ¶ 3.)  As a condition of employment, all Bon Secours employees must agree to follow the ERDs.  (*Id.*)

### A.     Bon Secours Position

Plaintiff Dr. Dan Giurca is a psychiatrist board-certified in Adult Psychiatry.  (*Id.* ¶¶ 12-13.)  In 2016, he was offered employment at Bon Secours but turned it down to work at Orange Regional Medical Center ("ORMC"), which is unaffiliated with WMCHealth.  (*Id.* ¶ 14.) Plaintiff nevertheless asked to be kept in mind for moonlighting opportunities at Good Samaritan and began the process of submitting his application for medical staff privileges.  (*Id.* ¶ 15.) Plaintiff received an employment contract on February 24, 2017, (*id.*), to which he raised several objections, including – referring to the ERDs – that in his view, it required physicians to "agree[] to the policies of a religious organization," (ECF No. 89-9 at 3).[2]  In response, Naim Korca, a Bon Secours employee, told Plaintiff:

> Bon Secours is [a] faith based organization, created by the sisters of Bon Secours and the value[s] of the organization are in line with [the] catholic church values of serving the poor and most vulnerable categories of society.  The values do not impede with your practice as [a] psychiatrist and [] conform [to] the laws of New York and [the] US.

---

[2] Citations to ECF Nos. 89-9 through 89-11, 89-18, 89-19, 89-35 through 89-37, 89-40, 89-42, 89-44, 89-46, and 89-55 refer to page numbers set by the Electronic Case Filing ("ECF") system.

The February 24, 2017 contract required all medical services provided at the facility to "be provided in accordance with (i) the [ERDs] . . . [and] the administrative and ethical policies of the Hospital, including the Bon Secours Health System Code of Conduct."  (Ds' 56.1 Stmt. ¶ 18.)

(*Id.* at 2.)  In response to Plaintiff's separate objection that the contract did not include insurance coverage, Korca said that the hospital might be able to cover Plaintiff's insurance if he were hired as a *per diem* physician rather than under a service contract.  (*Id.*)  Plaintiff responded that "[p]er diem without contract would be better," and added:

> I appreciate serving the poor but signing a contract recognizing the catholic church, can be problematic for some people.  I have the right to practice my own religion.  Keep in mind the catholic church has molested children – I have an issue with that, regardless of how many poor people they serve.

(*Id.*)  Korca responded that he would work on making Plaintiff a *per diem* physician.  (*Id.*)

On March 2, 2017, Plaintiff submitted some of his application materials to Bon Secours through an online portal and noted that "there were some issues with the contract but I will be per diem."  (ECF No. 89-11 at 4-5.)  On March 9, 2017, Bon Secours asked Plaintiff to provide application materials that were still outstanding.  (*Id.* at 3.)  On March 22, 2017, Bon Secours sent Plaintiff a letter agreement.  (ECF No. 89-10.)  The new contract included a provision on the ERDs:  "Your employment is subject to the policies, procedures and guidelines of [Bon Secours] and Hospital, including but not limited to . . . the [ERDs]."  (*Id.* at 5.)  On April 17, 2017, after not receiving the outstanding application materials, Bon Secours followed up with Plaintiff, asking him whether he intended to continue his application process.  (ECF No. 89-11 at 2.)  Plaintiff responded, "We are still discussing the terms but the contract language needs to state it is only for call from home via phone, not coming onsite."  (*Id.*)  The Bon Secours employee responded, "I will hold the processing of the application until contacted to begin again or to cease any further."  (*Id.*)

### B.    Position at Good Samaritan

On October 4, 2018, ORMC terminated Plaintiff's employment without cause.  (ECF No. 89-12.)  On November 5, 2018, Plaintiff reached out to an employee at Good Samaritan

regarding his interest in an "ER + medical floor consultation psy job in the Suffern location."
(ECF No. 89-13 at 3.)  The employee forwarded Plaintiff's resumé to Tera Colavito, who was
responsible for recruiting at Good Samaritan and who thought Plaintiff's interest "may be worth
exploring" because another doctor was looking to give up his "good Sam day." (*Id.*)  Colavito
forwarded Plaintiff's resumé to Corey Deixler, Senior Vice President of Physician Services for
Bon Secours, among others, and in response, Deixler "recall[ed] there was an issue with this
provider in the past." (*Id.* at 2.)  When asked what the issue was, Deixler responded that Plaintiff
never worked at Good Samaritan but had been interviewed. (*Id.*)

Colavito testified that at some point she reached out to Korca – whose name Plaintiff had
mentioned in a conversation he had had with the Bon Secours Medical Director for Psychiatry,
(*id.*) – and was told that Plaintiff had backed out of a previous contract because he did not want
to work for a Catholic facility. (ECF No. 89-77 ("Colavito Depo 1") at 38:15-23; *see also* ECF
No. 89-78 ("Colavito Depo 2") at 73:12-17 (Korca told Colavito that Plaintiff "had a problem
with the contract around the language related to our Catholic identity.").)

On February 15, 2019, Plaintiff contacted Colavito directly, inquiring as to whether there
were any open psychiatry jobs at Good Samaritan. (ECF No. 89-18 at 4; *see* D's 56.1 Stmt.
¶ 25.)  Plaintiff followed up on March 5 by telephone and recorded the conversation without
Colavito's knowledge, (Ds' 56.1 Stmt. ¶ 27), as he did with all other phone calls that are part of
the record.  Plaintiff again asked about openings at Good Samaritan in Suffern and Colavito said
that her understanding was that Plaintiff "had previously been offered a contract here and then
took the contract back because of . . . our Catholic . . . affiliation," and then asked whether
anything had changed. (ECF No. 89-19 at 2.)  Plaintiff responded that he declined the position
because he was offered a better one at ORMC. (*Id.*)  When Colavito asked whether Plaintiff was

still at ORMC, he responded that he was, (*id.*), which he now admits was a lie, (Ds' 56.1 Stmt. ¶ 30).[3]

Following this conversation, Plaintiff emailed Colavito, stating, "In our telephone conversation today you mentioned something about a clause in the contract offer from 2017 related to the Catholic Church.  Is this the reason my application is not considered?"  (ECF No. 89-18 at 4.)  Colavito replied:

> I asked about the clause because it is my understanding that you backed out previously because you did not want to work for a Catholic Facility.  If that information is inaccurate then I stand corrected.  Our affiliation has not changed so I just didn't want to pursue anything further if that remained a possible concern for you.  I will review further and be in touch.

(*Id.* at 3-4.)  Plaintiff responded that "[t]here was a clause in the contract language that seemed strange and I asked Na[i]m Korca about it," but confirmed that he was still interested in pursuing a job at Good Samaritan.  (*Id.*)

After speaking with Plaintiff, Colavito texted Dr. Nambi Salgunan, a psychiatrist at ORMC, and asked whether Plaintiff still worked there.  (Ds' 56.1 Stmt. ¶ 34.)  After "check[ing] it out," Dr. Salgunan responded on March 11, stating that "[n]o such name doctor" worked there. (*Id.*)  Colavito testified that she also spoke with Dr. Bhupinder Gill, a psychiatrist from Bon

---

[3] Plaintiff claims he lied about still being employed at ORMC because Colavito had "lied to me and said she had not received the [*curriculum vitae* ("CV")] that I had submitted in November [2018]."  (ECF No. 99 ¶ 10.)  Putting aside the logic of that claim, the transcript of the conversation reveals that Colavito did not deny having received Plaintiff's CV back in November.  Rather, when Plaintiff said he had inquired of another employee "a week or two ago" about open positions, and he thought he had emailed Colavito his CV, she responded, "I don't know if I received that in my email."  (ECF No. 89-19 at 2.)  Not only was her response hardly a denial, but in context it refers to "a week or two ago," not November 2018.

Secours, who told her that Plaintiff had been terminated from ORMC due to "bizarre behavior." (Colavito Depo. 2 at 70:15-24.)[4]

Plaintiff followed up on March 7, clarifying that when he previously applied to Bon Secours, he had a question about the *per diem* contract, "not that I 'did not want to work for a Catholic facility.'" (ECF No. 89-18 at 3.) He also asked for a copy of the ERDs, but Colavito did not respond. (*Id.*) When asked at her deposition why she did not send Plaintiff a copy of the ERDs, Colavito stated, "There wasn't a job available at that point and he had lied about his employment so I had no interest in pursuing anything further with him." (Colavito Depo. 2 at 63:2-13.)[5] When asked why she lost interest in interviewing Plaintiff, she testified, "Because when I had spoken to him he had told me that he was still employed by Orange Regional. When I learned that he was fired from there, I didn't want to hire a psychiatrist that lied right from the start." (Colavito Depo. 1 at 26:8-15.)

On March 8, 2019, Plaintiff called Colavito inquiring as to whether there were any open psychiatrist positions at Good Samaritan. (ECF No. 89-21; Ds' 56.1 Stmt. ¶ 39.) Colavito responded that there were no open positions but there might be some in the near future and she would reach out to him then. (ECF No. 89-21.) Plaintiff emailed her after the call, stating,

> It does not seem appropriate to be denied a job, and be discriminated against on the basis of religion. It appears that after I inquired about the clause in 2017, I was blacklisted. At present I was denied the consultation liaison position that I

---

[4] At his deposition, Dr. Gill did not recall having this conversation with Colavito. (ECF No. 98-4 at 34:25-35:7.) But "a deponent's failure to remember a particular event is insufficient to create a genuine issue of fact for summary judgment purposes." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 480 n.7 (S.D.N.Y. 2022) (cleaned up).

[5] Plaintiff argues that this is not the actual reason that Colavito did not respond because she was not made aware of Plaintiff's lie until March 11, when Dr. Salgunan texted Colavito, four days after Plaintiff's email. (ECF No. 89-20.) But Colavito did not recall, (Colavito Depo. 2 at 71:8-21), and the record does not otherwise reflect, when her conversation with Gill took place. And two of the intervening days between March 7 and 11 were a weekend.

have been inquiring about since Oct 2018.  The clause states that I have a right to
ask questions, and the issue is legitimate.  If a child comes to the ER distraught
due to being raped by a Catholic priest, do you expect the doctor to call the
Justice Center or follow the "[ERDs]" to cover up the crimes?  As an Orthodox
Christian do I have to become Catholic as a condition of employment?

(ECF No. 89-18 at 2-3.)  Colavito did not respond.

On June 24, Plaintiff emailed Colavito once more, stating,

I have not heard from you after my last email from Mar 8. . . .  As directed by the
contract terms, on Mar 7 I asked you for a copy of the [ERDs] and on Mar 8 you
told me no jobs are available, even though one was available on Mar 5.  I was not
applying for a job as a priest (religious position), but as a doctor (secular
position).  The hospital cannot invoke the First Amendment defense.  Asking a
doctor to accept religious directives as a condition of employment, is effectively
asking that doctor to change his existing religion.  The EEOC stated that is illegal
in the USA.

(*Id.* at 2.)  Colavito forwarded this email to Deixler with the text "Fyi . . ."  (ECF No. 89-25 at 2.)

On the same day, Plaintiff emailed an administrator named Loretta Modesto asking about job

openings and attaching a January 2019 post about an open psychiatrist job at Bon Secours.  (Ds'

56.1 Stmt. ¶ 43.)  Plaintiff did not receive a response.  (P's 56.1 Resp. ¶ 43.)

On June 6, Plaintiff filed a charge of religious discrimination and retaliation with the

EEOC, stating that Good Samaritan blacklisted him after he questioned a religious clause in the

contract, resulting in him being denied a position in March 2019.  (ECF No. 89-23.)

C.     **Position at WMC**

In July 2019, Plaintiff sought a position at WMC and contacted Andrea Ruggiero, a

recruiter responsible for filling positions at WMC, Mid-Hudson Regional Hospital in

Poughkeepsie, and the Health Alliance Hospitals in Kingston.  (Ds' 56.1 Stmt. ¶ 50.)  WMC had

a separate hiring process from Bon Secours, which used administrators who only recruited for

Bon Secours.  (*Id.* ¶ 4.)  WMC made hiring decisions based on the opinions of Dr. Stephen

Ferrando, the chair of the Department of Psychiatry (the "Department"), and Dr. Abraham

Bartell, the vice-chair of the Department. (*Id.* ¶ 5.) The screening process at WMC began with Bartell and Ferrando establishing the criteria for the position; then Human Resources ("HR") helped the doctors identify potential candidates; and Bartell conducted an initial phone screen to gauge whether each candidate had a genuine interest and to identify the people he wanted to bring in for an in-person interview. (*Id.* ¶ 6.) The decision to call back candidates for in-person interviews rested with Bartell and Ferrando, but Ferrando largely deferred to Bartell. (*Id.*)

If Bartell and Ferrando made the decision to hire a psychiatrist, that candidate would need to successfully apply for and obtain clinical privileges and a medical staff appointment through the WMCHealth Medical Staff Office as a pre-condition of employment. (*Id.* ¶ 7.) The credentialing and privileging process involves collecting information about the applicant's background including past employment verifications, public profiles, medical malpractice, legal information and case logs. (*Id.* ¶ 8.) The reasons why the applicant left prior positions are also obtained. (*Id.* ¶ 9.) Generally, after all information is collected, the Credentialing Committee decides to grant or deny clinical privileges and a medical staff appointment. (*Id.* ¶ 10.) If "red flags" are uncovered, the application will not go to the Credentialing Committee, and instead the Medical Staff Office will alert the personnel who made the offer and ask them to reconsider. (*Id.* ¶ 11.) If the "red flags" are significant, "such as a questionable work history or lawsuits against prior employers, the person would not be credentialed." (*Id.*)[6]

---

[6] The quoted language is from D's 56.1 Stmt., but it does not precisely summarize the underlying evidence, which is a declaration from the Director of Medical Staff Administration and Quality Special Projects at WMC. (ECF No. 92.) Her declaration states that "[r]ed flags include lawsuits against prior employers, lawsuits involving patients, misrepresentations made by the applicant during the employment application process, or questionable quality of care information," (*id.* ¶ 9), and that she had "never seen an applicant who sued a prior employer and/or lied during an interview make it through the credentialing process," (*id.* ¶ 12). But she did not say a person who had previously sued an employer could never be credentialed.

On July 18, Ruggiero forwarded Plaintiff's CV to members of the Department, including Ferrando and Bartell.  (*Id.* ¶ 55.)  Bartell responded that it was "[w]orth looking at perhaps we can set up a phone interview and go from there."  (*Id.* ¶ 56.)  Ferrando responded, "nocturnist?" which was one of the open positions at a WMC hospital in Valhalla, New York, and Bartell replied that they would need to see in what positions Plaintiff was interested.  (*Id.*)

On July 22, Ruggiero called Plaintiff, who expressed interest in relevant open positions.  (*Id.* ¶ 57; *see* ECF No. 89-35.)  At this time, there were three open positions at WMC:  (1) an adult consultation-liaison psychiatrist ("CL") position in Valhalla, (2) a nocturnist position in Valhalla, and (3) an outpatient and child/adolescent psychiatrist position in Poughkeepsie.  (ECF No. 90 ("Bartell Decl.") ¶ 3.)  Defendants contend that CL positions at WMC require subspecialty board certification – specifically, fellowship training and board certification in "Consultation-Liaison Psychiatry," (*id.*) – but the job posting stated only that candidates should be board-certified or board-eligible in psychiatry, (P's 56.1 Resp. ¶ 83).  During the call, Plaintiff expressed interest in positions at Good Samaritan, Bon Secours, and the WMC Valhalla hospital because of their proximity to his home, (ECF No. 89-35 at 6), but Ruggiero did not recruit for Bon Secours or Good Samaritan, (Ds' 56.1 Stmt. ¶ 63).  Nevertheless, during the phone call, Plaintiff asked Ruggiero to check whether Bon Secours has a religious affiliation, to which Ruggiero responded that it did not.  (ECF No. 89-35 at 7.)  Plaintiff further stated, "[S]omebody told me if that if [you] get a job at . . . that hospital or within that Bon Secours . . . core, you know, you have to, like, follow the directives of the Catholic Church as part of employment or something like that."  (*Id.*)  Ruggiero responded, "No, that's not accurate.  There, WMC, our network is an equal opportunity employer."  (*Id.*)  Plaintiff also inquired into a Bon Secours job

posting from January 2019 and Ruggiero told him that she would look into it but the position was likely no longer available.  (*Id.*)

Following her conversation with Plaintiff, Ruggiero emailed Bartell and Ferrando, stating that she considered Plaintiff to be a viable candidate and that he would be open to positions in Valhalla.  (ECF No. 89-41 at 3.)  Bartell then asked Ruggiero to set up a telephone interview with Plaintiff.  (*Id.*)  Ruggiero followed up with Plaintiff by email later that day, stating that the Bon Secours position was open and that she would like to set up a phone interview for the CL position in Valhalla as soon as possible.  (ECF No. 89-36 at 2.)  Plaintiff replied with his availability for a phone interview and stated, "I am interested in the Bon Secours position. Someone told me that as a condition of employment the contract requires all doctors to abide by the religious directives of the Catholic church.  Please advise if true."  (ECF No. 89-37 at 4.)  Ruggiero responded that, to her knowledge, that information was inaccurate but she would clarify and get back to him.  (*Id.* at 3.)  Ruggiero and Plaintiff agreed that he would speak with Bartell at 10 a.m. the next day, July 23, 2019.  (*Id.*)

Ruggiero then requested assistance from her manager, Emily Mehedin, (ECF No. 89-76 at 61:6-20), who forwarded Plaintiff's email to Deixler, who still worked for Bon Secours, (ECF No. 89-38 at 3-4).  Deixler responded, "We were not aware you were talking to this individual. Please discuss with Barbara."  (*Id.*)  Deixler was referring to Barbara Kukowski, in-house counsel for WMCHealth.  (Ds' 56.1 Stmt. ¶ 69.)  On July 23 at 9:40 a.m., Ruggiero emailed Bartell, but the substance of that email was redacted in discovery as an attorney-client communication, (ECF No. 89-41; ECF No. 89-26 at 8), and at 9:54 a.m., Ruggiero emailed Plaintiff telling him that Bartell was not available to speak that morning at 10 am and they would need to reschedule, (ECF No. 89-40 at 5; ECF No. 89-75 at 42:23-43:10).

Meanwhile, Kukowski discussed Plaintiff's application with Jordy Rabinowitz, the chief

HR officer for WMCHealth. (Ds' 56.1 Stmt. ¶¶ 72-73.) During their conversation, Kukowski

told Rabinowitz that Plaintiff had previously applied to Good Samaritan but his application was

ultimately rejected because "he had certain inconsistencies in his background." (ECF No. 88-4

at 20:3-21:20, 25:9-21.) Nevertheless, they agreed that "there was nothing necessarily in Dr.

Giurca's past that would prohibit him being interviewed by Dr. Bartell, and so we agreed that we

would let that interview go forward." (*Id.* at 26:9-13.) On July 24, Ruggiero wrote to Bartell, "I

apologize for the back and forth regarding this candidate. [redacted text] We will wait for your

feedback after your interview on how you would like to proceed with this candidate. Please let

me know when would work best for a phone screen." (ECF No. 89-41 at 1.) Bartell responded,

"Yes please lets set this up ASAP." (*Id.*) Ruggiero emailed Plaintiff that Bartell's schedule had

opened up and they arranged the phone interview for July 26, 2019. (ECF No. 89-42.)

Bartell conducted the telephone interview on that date. (Ds' 56.1 Stmt. ¶ 76.) He stated

in his declaration that he was not aware that Plaintiff had previously applied to Good Samaritan

or that Plaintiff had filed complaints against that entity for religious discrimination until Plaintiff

sought to depose him for purposes of this action.[7] (Bartell Decl. ¶¶ 9-10.) Bartell also stated in

his declaration that he and Ferrando were looking for two specific categories of psychiatrists to

fill the CL position at Valhalla: "(1) psychiatrists who were already subspecialty board certified,

---

[7] In Plaintiff's 56.1 Resp. he denies Defendants' claim that "[t]he only information that
Dr. Bartell had about Plaintiff came from his CV and a quick review of his fellowship file," and
adds that "Bartell knew that HR had cancelled two interviews with the candidate" and "Bartell
also knew whatever Ruggiero conveyed to him on July 23 and July 24 [which has been redacted
and made unavailable to plaintiff and his counsel]." (P's 56.1 Resp. ¶ 77 (alteration in original).)
Plaintiff provides no citations reflecting the cancellation of a second interview, and as far as the
Court can tell, only one interview was cancelled and then rescheduled.

and (2) those who had freshly completed a fellowship (or at least would so by the start date) and therefore would be likely to pass the board examination right away."  (*Id.* ¶ 7.)

During the interview, Plaintiff expressed interest in a position at Bon Secours and the CL position at Valhalla.  (ECF No. 89-44 at 3.)  Bartell did not hire for Bon Secours, so this position was "outside of [his] purview."  (Bartell Decl. ¶ 15.)  Bartell avers that he also determined that Plaintiff was not qualified for the CL position solely by looking at Plaintiff's CV;[8] Plaintiff did not have subspecialty fellowship training or board certification in Consultation-Liaison Psychiatry, and had completed his training five years ago and so was not prepared to sit for that certification exam.  (Bartell Decl. ¶ 13.)  Bartell states in his declaration that he interviewed Plaintiff knowing he was not qualified for the CL position because he "thought it would be worthwhile to see if Plaintiff might be interested in a different role, such as the nocturnist position," (*id.* ¶ 14), but Plaintiff stated during the interview that he was only interested in the CL role at Valhalla, (*id.* ¶ 15; ECF No. 89-44 at 2).  During the interview – the transcript of which is seven single-spaced pages, (ECF No. 89-44) – most of the conversation concerned the pay and hours of the job, (*id.* at 3-6), and Plaintiff mentioned that he had "a board in adult psychiatry" and asked if that would get him extra money, (*id.* at 5).  Bartell responded that the "number of years out" was built into the pay scale.  (*Id.*)  Bartell testified that he found Plaintiff's focus on compensation to be "off putting," (ECF No. 89-79 ("Bartell Depo. 1") at 46:19-22), and

---

[8] During the interview, Bartell took handwritten notes on a copy of Plaintiff's CV.  (Ds' 56.1 Stmt. ¶ 78.)  The CV included a line that read, "ABPN Certified Sep 2014, Board Eligible child & adolescent psychiatry Jul 2014."  (ECF No. 89-45.)  Bartell circled the word "Eligible" and wrote next to the circle "no brds," meaning "no boards."  (ECF No. 89-45; Bartell Decl. ¶ 17.)  "ABPN" apparently stands for American Board of Psychiatry and Neurology.  American Board of Psychiatry and Neurology, Inc., https://www.abpn.com/wp-content/uploads/2014/12/ABPNAcronymsTerms.pdf (last accessed Jan. 3, 2023).

made a handwritten note on Plaintiff's CV stating "$ focus" because he thought that "Plaintiff was overly concerned with money for an initial interview," (Bartell Decl. ¶ 17).

At the end of the call, when Plaintiff asked what the next step would be, Bartell stated that ideally it would be an in-person interview, but that Ferrando would be out until early August. (ECF No. 89-44 at 7.) On August 6, Bartell called Plaintiff and provided him with information about an open position at Good Samaritan. (ECF No. 89-46.) In response, Plaintiff asked whether Good Samaritan or Bon Secours "have like a religious affiliation with the Catholic Church, that one part of and a condition of employment is that you have to accept the directives of the Roman Catholic Church." (*Id.* at 2.) Bartell responded that it was his understanding that both Good Samaritan and Bon Secours were equal opportunity employers but he would double check. (*Id.*)

The following day, Plaintiff called Ruggiero to follow up on the "Bon Secours . . . issue" and the open position at Good Samaritan that Bartell had mentioned, and she told him she had not had the chance to get the answer to his question regarding the ERDs but would follow up with Bartell as to the position. (Ds' 56.1 Stmt. ¶ 89.) On August 9, Plaintiff called Bartell to ask again about the Good Samaritan position, and Bartell replied that he was still confirming details, but told Plaintiff, regarding the ERDs, "There's no issues in terms of the tene[]ts of the church. Number one, it's no longer a Catholic Charities hospital. Number two, you're an [Advance Physician Services ("APS")] employee at Westchester Medical Center." (ECF No. 89-48.) APS is a corporate entity that hires physicians for the network. (Ds' 56.1 Stmt. ¶ 88.)[9] On August 9

---

[9] Bartell testified that he conveyed his "impression," which was limited because he did not recruit for Bon Secours, and that his referral of Plaintiff to Bon Secours was just a "collegial" action, given that WMC could not use Plaintiff. (ECF No. 88-5 at 42:13-43:11.)

and 16, Plaintiff emailed Ruggiero asking for further details related to the Good Samaritan

position.  (ECF No. 89-49 at 3.)

Sometime after Plaintiff's interview, Bartell and Ferrando met and discussed Bartell's

impressions of Plaintiff.  (Bartell Depo. 1 at 46:3-9.)  Bartell testified that he told Ferrando,

> The concern about the CL position was that [Plaintiff] was not trained –
> fellowship trained or board eligible so he wouldn't be eligible for that position,
> that he – I had shared the information about the nocturnist position and that there
> might be another position within the network.  I shared with [Ferrando] that the
> conversation was heavily focused on compensation, which I found a little off
> putting in a first screen.

(*Id.* at 46:10-23.)  Ferrando testified that Bartell told him Plaintiff "was not interested in a

nocturnist position" and that Bartell "used a strong adjective, something like slimy or swarmy.

He said he was primarily interested in money.  He said that he was not board certified, at which

point I recall saying forget it."  (ECF No. 89-81 ("Ferrando Depo.") at 18:8-20.)  According to

Ferrando, Bartell "is a very excellent judge of character" and if he used "strong language like

that . . . and somebody's money hungry and . . . not board certified after a number of years," that

person was not worth pursuing.  (*Id.* at 27:18-28:6.)  When Bartell referred to Plaintiff's lack of

board certification, he was referring to the fact that Plaintiff was neither board certified nor board

eligible in CL.  (*See* ECF No. 88-5 at 35:14-36:2, 46:12-19.)  After Dr. Bartell told Ruggiero that

they were not interested in hiring Plaintiff for the CL position, (ECF No. 89-80 ("Bartell Depo.

2") at 67:10-18), Ruggiero confirmed that Bartell did not need to reach out to Plaintiff because

he would receive a rejection letter from the network, (ECF No. 89-53.)

On December 14, 2019, Plaintiff filed an EEOC charge against WMC alleging

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII").  (ECF No. 89-55.)

### D.     Prior Employment History

On December 10, 2018, Plaintiff filed a lawsuit against Montefiore Health System, Inc.

("Montefiore"), *Giurca v. Montefiore Health Sys., Inc.*, No. 18-CV-11505 (S.D.N.Y.), where

Plaintiff had been employed from March 2013 to January 2017, (ECF No. 89-1).  In his

Amended Complaint in that case, Plaintiff stated that he had:  received a "Focused Professional

Practice Evaluation" accusing him of deficiencies in "performance, professionalism, and

communication," (ECF No. 89-27 ¶ 44); recorded conversations with his colleagues and

supervisors, (*id.* ¶¶ 20, 67, 70); reported his colleagues to supervisors as well as the New York

State Office for Mental Health, (*id.* ¶¶ 17, 28, 31-39, 41-42, 66-70); been put on a probation plan

and told that his employment was "not sustainable," (*id.* ¶ 49); lost his privileges to moonlight,

(*id.* ¶ 67); and been deemed a security risk by the Montefiore security office, (*id.* ¶ 73).

On February 5, 2019, Plaintiff filed a lawsuit against ORMC, *Giurca v. Orange Reg'l

Med. Ctr.*, No. 19-CV-1096 (S.D.N.Y.), where he worked from January 2017 until January 2019,

(ECF No. 89-1).  In the Amended Complaint in that case, Plaintiff stated that he had:  been

accused of making residents perform the bulk of the work for an article he wrote, (ECF No. 89-

17 ¶¶ 42-43); recorded conversations with his colleagues, (*id.* ¶¶ 43, 50); reported his colleagues

to supervisors and the New York Office of Mental Health, (*id.* ¶¶ 21, 24-26, 56); and been fired

from ORMC, (*id.* ¶ 47).

The Amended Complaints in both cases were publicly available as of August 2019.

(ECF Nos. 89-14, 89-15.)

### E.     Procedural History

Plaintiff filed the original complaint in this action on August 19, 2019.  (ECF No. 1.)  On

December 4, 2019, the Court granted Defendants' request for a pre-motion conference

concerning a proposed motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  (ECF

No. 19.)  At the conference on January 10, 2020, the Court gave Plaintiff leave to amend.  (*See*

Minute Entry dated Jan. 10, 2020.)  Plaintiff filed an Amended Complaint on February 10, 2020,

(ECF No. 21 ("AC")), alleging violations of Title VII for religious discrimination, failure to

accommodate, and retaliation, as well as state law claims for intentional infliction of emotional

distress and negligent infliction of emotional distress, (*id.* ¶¶ 56-73).  Following briefing, the

Court issued a bench ruling dismissing all of the claims except the Title VII retaliation claim.

(ECF No. 89-66.)  Discovery ensued, followed by the instant motion.  (ECF Nos. 84-103.)

## II.  **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423,

428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where a

declaration is used to support or oppose the motion, it "must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the . . . declarant is competent to

testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino,*

*Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion" or "grant summary judgment if the motion and

supporting materials – including the facts considered undisputed – show that the movant is

entitled to it." Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

### A.   Legal Framework

Title VII prohibits employers from discriminating against any "employee[] or applicant[]

for employment" who "has opposed any practice [that is] made an unlawful employment

practice" under Title VII.  42 U.S.C. § 2000e-3(a).  "Retaliation claims under Title VII . . .

are . . . analyzed . . . pursuant to the *McDonnell Douglas* burden-shifting evidentiary

framework." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 315 (2d Cir. 2015).  Under that framework,

the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  The burden of proof at this stage is "'*de minimis*,'"  *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 582 (S.D.N.Y. 2012) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)), "but it is not non-existent," *Pleener v. N.Y.C. Bd. of Educ.*, No. 05-CV-973, 2007 WL 2907343, at *11 (E.D.N.Y. Oct. 4, 2007) (cleaned up), *aff'd*, 311 F. App'x 479 (2d Cir. 2009) (summary order).

To establish a *prima facie* case of retaliation, the plaintiff must show:  (1) participation in a protected activity, (2) that the defendant was aware of that activity, (3) that the plaintiff suffered a materially adverse action, and (4) a causal connection between the protected activity and that adverse action.  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (cleaned up).

As to the first element, the plaintiff "need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013) (cleaned up).

"As to the second element of the *prima facie* case, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013) (*per curiam*) (cleaned up).  That is, there must be something in the protests "that could reasonably have led [the employer] to understand that [unlawful discrimination] was the nature of her objections." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

As to the third element of the retaliation test, a materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (cleaned up); *see Fincher v. Depository Tr. & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010). A failure to hire is an adverse employment action. *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018).

Finally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* A plaintiff can establish the requisite causal connection in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 10-CV-3534, 2012 WL 850607, at *8 (E.D.N.Y. Mar. 13, 2012) (cleaned up).

Once the plaintiff makes a *prima facie* showing of discrimination or retaliation, a "rebuttable presumption of retaliation arises" and the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory [or non-retaliatory] reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 134 (2d Cir. 2000); *see Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (*prima facie* "showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action.") (cleaned up). "The defendant must

20

clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination [or retaliation] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original) (cleaned up).

If the defendant proffers a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment action, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination or retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Ya-Chen Chen*, 805 F.3d at 70. The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory [or non-retaliatory] reasons proffered by the defendant were false, and that more likely than not discrimination [or retaliation] was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (cleaned up). "To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination [or retaliation]." *Id.* (cleaned up). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination [or retaliation]." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated or retaliated. *See Reeves*, 530 U.S. at 143.

**B.      Analysis**

In ruling on Defendants' motion to dismiss, I held that the only plausible allegation underlying Plaintiff's retaliation claim was that the failure to hire Plaintiff in August 2019 could have been in retaliation for his raising concerns and objections to the ERDs earlier in August 2019. (ECF No. 89-66 at 24:23-25, 33:1-3.) I also mentioned that Colavito had told Plaintiff she

would contact him if a position opened up, and she did not.  (*Id.* at 24:8-11.)  In their summary

judgment papers, the parties have gone well beyond these allegations, but I am going to address

only the claims that survived the motion to dismiss.

**1.**      **Failure to Hire**

a.    <u>Summer 2019 speech</u>

As to Defendants' alleged failure to hire Plaintiff in retaliation for his July and August

2019 objections to the ERDs, I found at the motion to dismiss stage that Plaintiff's questions

regarding the religious clause were plausibly protected activity, and had a close temporal

relationship to Plaintiff's rejection.  (*Id.* at 20:13-21:9, 23:21-24:25.)  But with the benefit of the

transcripts of Plaintiff's conversations regarding the religious clause, I conclude that his

statements in July and August 2019 are not protected activity.  In Plaintiff's conversations with

Ruggiero and Bartell, he did not raise any objection to or protest the ERDs; he simply asked if

the jobs at issue required adherence to the precepts of the Catholic church.  (ECF No. 89-35 at 7

(Plaintiff stating to Ruggiero, "somebody told me if that if you get a job at uh that hospital or

within that Bon Secours uh core, you know, you have to, like, follow the directives of the

Catholic Church as part of employment or something like that"); (ECF No. 89-37 at 4 (Plaintiff

stating to Ruggiero, "Someone told me that as a condition of employment the contract requires

all doctors to abide by the religious directives of the Catholic church"); (ECF No. 89-46 at 2

(Plaintiff asking Dr. Bartell whether Good Samaritan or Bon Secours "have like a religious

affiliation with the Catholic Church, that one part of and a condition of employment is that you

have to accept the directives of the Roman Catholic Church").)  Plaintiff did not say that such a

requirement would be a dealbreaker for him, let alone protest that it would be an unlawful

22

employment practice if the answer were yes.[10]  Asking is not the same as protesting, so the

employer could not have understood Plaintiff's inquiries as the latter.  *See Chacko v. DynAir*

*Servs., Inc.*, 272 F. App'x 111, 113 (2d Cir. 2008) (summary order) (no protected activity where

"[t]he record reflects that although [plaintiff] asked about the promotion policy, he did not

suggest that he was complaining about discrimination"); *Velasquez v. Goldwater Mem'l Hosp.*,

88 F. Supp. 2d 257, 264 (S.D.N.Y. 2000) (no protected activity where employee asked if there

was a policy but never said she believed it was discriminatory or linked it to her protected

status).  Indeed, both Ruggiero and Bartell understood Plaintiff's question to be whether

Defendants were equal opportunity employers – in other words, whether there was a religious

qualification for the jobs.  (ECF No. 89-35 at 7; ECF No. 89-46 at 2.)  *See Colon v. N.Y.C. Hous.*

*Auth.*, No. 16-CV-4540, 2021 WL 2159758, at *12 (S.D.N.Y. May 26, 2021) ("[I]mplicit in the

requirement that the employer have been aware of the protected activity is the requirement that it

understood, or could reasonably have understood, that the plaintiff's opposition was directed at

conduct prohibited by the statute.") (cleaned up).

    Even if Plaintiff's August 2019 inquiries were protected activity, and causation could be

inferred by temporal proximity to get Plaintiff past the *prima facie* stage, and even if there were a

question of fact as to whether Defendants' proffered legitimate, nondiscriminatory reasons were

pretextual, a reasonable jury could not ultimately find that Plaintiff would have been hired at

WMC but for his inquiries because he was not qualified for the position, in that he could not

have been credentialed.  Defendants have shown, and Plaintiff has not disputed, that Plaintiff

would not have been able to obtain clinical privileges and a medical staff appointment, as is

---

[10] Even if Plaintiff had voiced actual opposition to the ERDs in August 2019, as he had
earlier, he could not have had a good-faith reasonable belief that he was opposing a practice
prohibited by Title VII, for the reasons discussed below in connection with his 2017 speech.

required for every candidate hired at WMC.  (Ds' 56.1 Stmt. ¶ 7.)  The credentialing and

privileging process that the WMCHealth Medical Staff Office conducts involves the collection of

information about Plaintiff's background, including past employment verifications, public

profiles, medical malpractice, legal information and case logs.  (*Id.* ¶ 8.)  That process would

have revealed Plaintiff's lawsuits against Montefiore and ORMC, and the facts alleged in his

underlying Amended Complaints, including that he was fired from ORMC, (ECF No. 89-17

¶ 47), lost privileges at Montefiore, (ECF No. 89-27 ¶ 67), was accused of misconduct, (*id.*

¶¶ 44, 49; ECF No. 89-17 ¶¶ 42-43), recorded his colleagues and supervisors, (ECF No. 89-27 ¶¶

20, 67, 70; ECF No. 89-17 ¶¶ 43, 50), made repeated allegations about his colleagues to

supervisors and state regulatory agencies, (ECF No. 89-27 ¶¶ 17, 28, 31-39, 41-42, 66-70; ECF

No. 89-17 ¶¶ 21, 24-26, 56), and had been deemed a security risk at Montefiore, (ECF No. 89-27

¶ 73).  These allegations would constitute significant "red flags" that would have prevented

Plaintiff from being credentialed.  (Ds' 56.1 Stmt. ¶ 11 ("If the 'red flags' were significant, such

as a questionable work history or lawsuits against prior employers, the person would not be

credentialed, *i.e.*, given clinical privileges to work at a WMCHealth facility, and therefore could

not be employed."); ECF No. 92 ¶ 9 ("Red flags include lawsuits against prior employers,

lawsuits involving patients, misrepresentations made by the applicant during the employment

application process, or questionable quality of care information.").)

 Plaintiff does not dispute the above facts, but argues that there can be more than one but-

for cause of an event.  (ECF No. 85 ("P's Opp.") at 10.)  That may be so, but a Title VII

retaliation plaintiff must still show "that the unlawful retaliation" – here, the failure to hire –

"would not have occurred in the absence of the alleged wrongful action or actions of the

employer."  *Nassar*, 570 U.S. at 360; *see Zann Kwan v. Andalex Gp. LLC*, 737 F.3d 834, 846 (2d

Cir. 2013) ("'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.").[11]  Plaintiff cannot show that he would not have been rejected for the job – in other words, that he would have been hired – in the absence of retaliatory motive, because his inability to get credentialed  would have prevented his hiring.[12]  *See Saji*, 724 F. App'x at 15-16 (affirming grant of summary judgment on retaliatory failure-to-hire claim when plaintiff was not qualified for the open position); *Menoken v. Weichert*, No. 16-CV-83, 2019 WL 4418757, at *10 (D.D.C. Sept. 16, 2019) (granting summary judgment on retaliatory failure-to-hire claim in part because Plaintiff would not have been hired because of her low examination score), *aff'd sub nom. Menoken v. Cabaniss*, No. 19-5319, 2020 WL 1487743 (D.C. Cir. Mar. 12, 2020); *cf. Crespo v. Harvard Cleaning Servs.*, No. 13-CV-6934, 2014 WL 5801606, at *6 (S.D.N.Y. Nov. 7, 2014) (collecting cases for proposition that passing background check is legitimate job qualification).  Even under the more plaintiff-friendly motivating-factor standard applied in discrimination claims, causation cannot be shown where the employee would not have qualified

---

[11] *Zann Kwan* noted in a footnote that "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." 737 F.3d at 846 n.5.  That may usually be the case – where, for example, the plaintiff claims retaliation, which the defendant disputes, and the defendant claims poor performance, which the plaintiff disputes – and the question is the extent to which each factor existed, and if so, the extent to which it contributed to the decision.  But here it is undisputed that the factor to which Defendants point – Plaintiff's disqualifying work history – would have prevented him from meeting a precondition of employment.  The Second Circuit has recognized that even where the employer's intent is at issue, "to defeat a motion for summary judgment, [a plaintiff] must do more than simply show that there is some metaphysical doubt as to the material facts." *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 15 (2d Cir. 2018) (summary order) (cleaned up).

[12] In other words, if Defendants show that Plaintiff would not have been hired for reason A (because he could not be credentialed), then Plaintiff cannot show that he would have been hired but for reason B (retaliatory animus).

for the job in any event.  *See E.E.O.C. v. Con-Way Freight, Inc.*, 622 F.3d 933, 936 (8th Cir. 2010) ("Because [applicant] would not have been hired regardless of the discriminatory animus, the plaintiffs cannot establish a causal link between the alleged discriminatory animus and the decision not to hire her."); *Robair v. CHI St. Luke's Sugarland*, No. 16-CV-776, 2017 WL 2805190, at *11 (S.D. Tex. June 12, 2017) ("[T]estimony that a successful background check was a requirement for employment was uncontroverted. . . .  [I]n the case of a failure to hire, an employee should not be placed in a better position than he would have been but for the discrimination . . . ."), *report and recommendation adopted*, 2017 WL 2805000 (S.D. Tex. June 28, 2017).

Moreover, Plaintiff's argument regarding Defendants' hiring policy misconstrues the evidence.  Plaintiff contends that Defendants have admitted that they do not hire candidates that have sued prior employers and that this policy demonstrates their retaliatory animus.  (P's Opp. at 10; *see* P's 56.1 Resp. ¶ 11.)[13]  But reviewing the evidence in context demonstrates that it is not merely the fact of the prior lawsuit but the information contained in the lawsuit that Defendants review during the credentialing and privileging process.  (ECF No. 92 ¶ 5 (Medical Staff Office reviews entire work history and hospital affiliations, personal references, case logs and malpractice history); *id.* ¶ 6 (credentialing specialist collects public profiles and lawsuit information via Google or media searches and inquiry into National Practitioner Data Bank, which maintains records of privilege revocations and events that may reflect on professional competence or conduct); *id.* ¶ 7 (credentialing specialist seeks verification of employment, appointments and reasons why applicant left, and follows up if reasons are not provided).)  This

---

[13] Defense counsel's wording of paragraph 11 of Ds' 56.1 Stmt. did not help matters, as noted in footnote 6 above.

inquiry would have, in Plaintiff's case, revealed the allegations against Plaintiff that he recounted

in his Montefiore and ORMC lawsuits.  (*Id.* ¶ 11.)  It is these allegations that would have

prevented Plaintiff from being credentialed.  (*See id.* ¶ 12 ("Indeed, during my tenure, a

physician applicant has never applied with as negative a past employment history as the history

summarized above.  Based on my thirty-three years of experience vetting physicians, I would

firmly recommend against credentialing or offering Medical Staff membership to Plaintiff

because there is a clear professional risk to WMCHealth.  Based on that same experience, I am

sure my recommendation would be followed, and Plaintiff would not be credentialed and

therefore could not meet the contractual conditions of employment.").)

Because the temporally proximate speech was not protected activity, and because no

rational jury could find that Plaintiff would have been hired at WMC but for retaliatory motive,

the retaliation claim based on Plaintiff's statements during the summer of 2019 fails.

b.    2017 speech

The only activity identified in the AC that could be interpreted as Plaintiff protesting an

allegedly discriminatory practice was Plaintiff's objection to the ERDs in 2017, (AC ¶¶ 19, 23),

but that was too far removed temporally from any of the surviving adverse actions to plausibly

allege causation, *Cobian v. New York City*, No. 99-CV-10533, 2000 WL 1782744, at *18

(S.D.N.Y. Dec. 6, 2000) ("Standing alone, the lapse of more than four months . . . is insufficient

evidence of a causal connection."), *aff'd*, 23 F. App'x 82 (2d Cir 2001) (summary order).[14]  And

upon reflection, I find that Plaintiff's objection to the ERDs cannot be a protected activity

because it was not objectively reasonable for Plaintiff to think he was protesting an employment

practice made illegal by Title VII.  To establish engagement in a protected activity, a plaintiff

---

[14] The same would be true of Plaintiff's statements to Colavito in March 2019.

"need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Galdieri-Ambrosini*, 136 F.3d at 292 (cleaned up). "The objective reasonableness . . . is to be evaluated from the perspective of a reasonable similarly situated person." *Kelly*, 716 F.3d at 17. I explained at the motion to dismiss stage why Plaintiff's reading of the employment contracts was not reasonable:

> Plaintiff has not described how his agreement to adhere to the ERDs in the conduct of his profession would conflict with his adhering to his personal religious beliefs, nor has he identified any tenet of his religion that prohibits him from agreeing to adhere to the ERDs in the conduct of his professional life. He is able to attempt to fit the square peg of professional conduct into the round hole of religious belief only by characterizing the ERDs or the Agreements as a statement of personal adherence to Catholicism. But that is not a reasonable reading of the documents, which quite plainly are statements of how the signer will conduct his medical practice while employed by the hospital, not a statement of religious belief.

> The Professional Services Agreement simply requires that physicians provide services in accordance with the ERDs, and the Per Diem Agreement likewise says, "Your employment is subject to" the ERDs. Nothing in the Agreements requires Plaintiff to practice, agree with, or profess a belief in Catholicism or its tenets.

> Put another way, all Plaintiff was required to do was say that he agreed to comply with ERDs at work; he was not required to say he personally agreed with the ERDs or the views of the Roman Catholic Church. He was not, as he argues, asked to make a "formal statement in writing . . . that he would formally recognize as well as agree to be bound to the Religious Directives of the Roman Catholic Church," . . . or "attest to 'the principles of . . . the Catholic faith,'" . . . he was asked to agree to be bound to particular conduct in working at Defendants' facilities. He remained entirely free to disagree with and disregard the directives of the Church in his personal life.

> He claims he was required to sign a contract that "in and of itself requir[ed] him to state something he found religiously objectionable," . . . but all it required him to say is that he would provide services in accordance with the ERDs – which he says . . . did not conflict with his beliefs and which he would have been perfectly willing to do. To the extent he believed the Agreements required him to state he would be bound by Church doctrine in general, that is an implausible reading.

> For example, if Plaintiff were an observant Muslim or Jew and said he refused to sign the Agreement because it required him to eat pork and therefore violated his bona fide religious belief against consumption of pork, he would not have a Title VII claim unless the contract plausibly required him to eat pork. His refusal to eat pork would be a bona fide religious belief but his belief that the contract required him to eat pork would not be. Likewise here, Plaintiff's belief that signing the contract would amount to adoption of Catholic dogma is an idiosyncratic, subjective misreading of the contract, which is secular conduct, not a bona fide religious belief.

(ECF No. 89-66 at 14:1-16:4 (second alteration in original) (emphasis added).) Because there was nothing in the ERDs or the contract, read objectively reasonably, that conflicted with Plaintiff's (or anyone's) religious beliefs, a reasonable person in Plaintiff's position could not regard them as an unlawful employment practice. Thus, even if Plaintiff's protest against them was not too remote, his protest would not constitute a protected activity because it was based on an objectively unreasonable misreading of the employment contracts.[15]

Even if Plaintiff's objection to the ERDs in 2017, or March or June 2019, was protected activity, there is no evidence of retaliatory animus in the decision not to hire Plaintiff in August 2019. There is no evidence that the decisionmakers, Bartell and Ferrando, knew of those objections, let alone wanted to retaliate against him for them. Plaintiff's only argument on this

---

[15] The same is true of Plaintiff's email communications with Colavito in March and June 2019, the latter of which is in any event unmentioned in the AC. The unreasonableness of Plaintiff's interpretation is manifest. He wrote, "If a child comes to the ER distraught due to being raped by a Catholic priest, do you expect the doctor to call the Justice Center or follow the '[ERDs]' to cover up the crimes? As an Orthodox Christian do I have to become Catholic as a condition of employment?," (ECF No. 89-18 at 2-3), and, "I was not applying for a job as a priest (religious position), but as a doctor (secular position). The hospital cannot invoke the First Amendment defense. Asking a doctor to accept religious directives as a condition of employment, is effectively asking that doctor to change his existing religion," (*id.* at 2). There is nothing in the ERDs remotely requiring the covering up of crimes or conversion to Catholicism, (ECF No. 89-2), and thus those objections are objectively unreasonable and cannot constitute protected activity. Indeed, the ERDs direct all health care professionals employed by Bon Secours to "report cases of abuse to the proper authorities in accordance with local statutes." (*Id.* at 21.)

point is that Bartell knew that Ruggiero canceled and then rescheduled his interview, and that

Bartell received an email from Ruggiero the morning of the originally scheduled interview, the

contents of which were redacted in discovery.  (P's 56.1 Stmt. ¶ 77; *see* ECF No. 89-41; ECF

No. 89-26 at 8.)  To conclude that those emails informed Bartell of Plaintiff's previous protests

would be sheer speculation, as the content of the emails is unknown to Plaintiff and would never

be put before a jury.  To allow Plaintiff to argue to a jury about the possible content of the emails

would put Defendants in the impermissible position of having to waive privilege or risk a verdict

based on speculation.  The one thing that is known is that whatever was in the emails did not

derail Bartell's interest, as his response, once told that he could go forward with the interview,

was that he would like to do so as soon as possible.  It is obvious that whatever was

communicated to Bartell did not provoke any hostility toward Plaintiff,[16] and there is not a shred

of evidence that Bartell knew of Plaintiff's previous objections to the ERDs or of his

communications with Colavito – who was not involved in hiring for WMC and had nothing to do

with Plaintiff's August application – earlier that year.[17]

Plaintiff has therefore failed to raise a triable issue of fact as to WMC's decision not to

hire him in August 2019.

### 2.    Failure to Follow Up

As to Colavito not reaching out to Plaintiff regarding an open position at Bon Secours in

the summer of 2019, I find that this does not rise to the level of an adverse action.  Colavito

---

[16] Having reviewed the emails *in camera*, I can assure Plaintiff that they do not contain any mention of Plaintiff's alleged protected activity.

[17] The AC does not suggest that Plaintiff was retaliated against for filing his EEOC complaint against Good Samaritan in June 2019, but even if it did, that is likely not protected activity for the same reasons as Plaintiff's request for accommodation discussed above.  And even if it were protected activity, there is again no indication that the decisionmakers, Bartell and Ferrando, were aware of it at the time of the adverse action.

offered to keep an eye out for open positions as a courtesy, but such notification was not

something to which Plaintiff was entitled, and withholding that favor does not amount to an

adverse action.  *See Burlington N.*, 548 U.S. at 68 (action that might well have dissuaded

reasonable worker from making or supporting charge of discrimination does not include "petty

slights, minor annoyances, and simple lack of good manners"); *cf. Pierre v. Napolitano*, 958 F.

Supp. 2d 461, 483-84 (S.D.N.Y. 2013) (snubbing by supervisor too trivial to constitute adverse

action for retaliation claim).  Additionally, Plaintiff was aware of the open position, (ECF No.

89-46), and there is no evidence that he actually applied, *see Brown v. Coach Stores, Inc.*, 163

F.3d 706, 710 (2d Cir. 1998) ("We read *McDonnell Douglas* and *Burdine* generally to require a

plaintiff to allege that she or he applied for a specific position or positions and was rejected

therefrom . . . .); *Johnson v. U.S. Dep't of Homeland Sec.*, No. 09-CV-975, 2010 WL 2773541, at

*4 (N.D.N.Y. July 12, 2010) ("Plaintiff must show that he applied for a specific vacant position

for which he was qualified, and that he did not get the job.'") (cleaned up).

  Further, even if Plaintiff could establish a *prima facie* case based on Colavito's failure to

follow up, Plaintiff cannot show that he would have been hired but for Defendants' retaliatory

intent, because by his own account he never would have agreed to the ERDs, (D's 56.1 Stmt.

¶ 98), which were mandatory, (*id.* ¶ 3).  Accordingly, he would never have been hired at Bon

Secours or Good Samaritan.  Plaintiff makes only two arguments to the contrary.  First, he

contends that whether he would have signed the ERDs is irrelevant to whether Defendants were

motivated by retaliatory intent.  (P's Opp. at 10.)  That is true, but whether Plaintiff would have

signed is relevant to whether any such intent was a but-for cause of his not being hired at Bon

Secours, and precludes such a finding.  He also alleges that he "may have been able to come to

some resolution that would have allowed him to work there despite the ERDs." (*Id.*)  But the

evidence is undisputed that all physicians were required to sign them to work at Bon Secours hospitals, (D's 56.1 Stmt. ¶ 3), and indeed, Plaintiff acknowledged as much in the AC, when he alleged that Bon Secours would not modify its standard contract with respect to the ERDs or even engage in a dialogue about doing so, (AC ¶¶ 21-22).

Thus, there is no fact dispute requiring trial as to Colavito not reaching out to Plaintiff about the open position.

## IV.  **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 84), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: January 18, 2023
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.